UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| PAUL D.S. EDWARDS,<br><br>                                        Plaintiff,<br><br>        v.<br><br>JUAN MARTINEZ, INC., *et al.*,<br><br>                                        Defendants. | Case No. 2:20-cv-00570-ART-DJA<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |
| SERGIO BRANDON TAMEZ, *et al.*,<br><br>                                Counter Claimants,<br>        v.<br><br>PAUL D.S. EDWARDS,<br><br>                                Counter Defendant. | |

## I.    BACKGROUND

Plaintiff Paul D.S. Edwards sued Defendants Sergio Brandon Tamez and Juan Martinez Inc. d/b/a/ Century 21 Americana ("Century 21") for unsolicited telemarketing calls that he received on January 17, 2019. Mr. Tamez countersued for Mr. Edwards's recording of those calls in violation of NRS 200.620. Both parties presented argument and testimony in a two-day bench trial before the Court.

The Court addresses facts and law relevant to these questions as required by Federal Rule of Civil Procedure 52(a). Any findings of fact set forth are findings of fact even if stated as conclusions of law, and any conclusions of law are conclusions of law even if stated as findings of fact.

1

## II.   FINDINGS OF FACT

On January 17, 2019, Mr. Edwards received multiple unsolicited telemarketing calls on his residential landline telephone and his cellular telephone from Mr. Tamez, a realtor speaking on behalf of Century 21, who wanted to discuss real-estate opportunities in Mr. Edwards's neighborhood. Uninterested in the offer, Mr. Edwards surreptitiously recorded the conversations and expressed incredulity that Mr. Tamez would cold-call him, given that he had listed his phone numbers on the National Do Not Call Registry ("NDNCR").

The Court first considers the factual issues regarding the incident, including how many phone calls Mr. Tamez made to Mr. Edwards, the content of those calls, Mr. Tamez's relationship with Century 21, and Mr. Tamez's knowledge of the Telephone Consumer Protection Act ("TCPA").

### A. Mr. Edwards Received Four Calls from Mr. Tamez

The parties dispute the number of times Mr. Tamez called Mr. Edwards on the morning of January 17, 2019. Mr. Edwards claims that Mr. Tamez called him four times, twice to each number, with each number first receiving a silent or "deadair" call followed by a call in which Mr. Tamez spoke to Mr. Edwards. Mr. Edwards recorded all four calls and provided three phone logs: (1) a personal log of calls maintained by him (Pl.'s Trial Ex. 44); (2) a call log downloaded from Cox, Mr. Edwards's landline provider at the time (Pl.'s Trial Ex. 42); and (3) a bill from Verizon, his cellular carrier at the time (Pl.'s Trial Ex. 40). Mr. Tamez, who admits to the two conversation calls but denies making the two deadair calls, offered no documentary evidence with respect to the four calls at issue.[1]

---

[1] Mr. Tamez's personal Sprint record shows that he called or received a call from Mr. Edwards landline at 11:45 a.m. on January 17, 2019. (Def.'s Trial Ex. 502.) Mr. Edwards did not allege a TCPA violation related to that call and it appears to have no bearing on whether Mr. Tamez called Mr. Edwards two (as

2

Mr. Edwards testified that the four calls came in quick succession starting at 10:44 a.m., the first two to his landline and the second to his cell phone. Mr. Edwards testified that he noted these calls on his personal phone log, which he has kept for many years on his desk, by his phone, so that he can make contemporaneous notes of the calls he makes and receives. That log shows that Mr. Edwards received four calls from "Sergio Tamez," listing Mr. Tamez's cellular phone number, on January 17, 2019, at 10:44 a.m., 10:45 a.m., 10:46 a.m., and 10:48 a.m. (Pl.'s Trial Ex. 44.) Mr. Edwards's Cox telephone log, which contains a URL indicating it was downloaded from Cox Communications' website, also shows that Mr. Tamez called Mr. Edwards four times, in quick succession, on January 17, 2019. (Pl.'s Trial Ex. 42.) The times of the calls correspond closely to Mr. Edwards's personal call log, and the log shows the two calls that Mr. Tamez admitted making. (*See* Pl.'s Trial Ex. 44.)

Regarding the first call, Mr. Edwards's personal phone log and the Cox log indicate that Mr. Tamez called Mr. Edwards's residential landline telephone at 10:44 a.m. (Pl.'s Trial Exs. 42, 44.) Mr. Edwards testified that he answered the call, but it was silent, which he noted in his log as "ANS-DEAD AIR." *Id.* Mr. Edwards credibly testified that his caller ID system showed information identifying Mr. Tamez as the caller, which matches the information on the Cox log.

The second call, as detailed in Mr. Edwards's personal phone log and the Cox log, was at 10:45 a.m. (Pl.'s Trial Exs. 42, 44.) Mr. Edwards testified that he received this call from Mr. Tamez, who admitted to this call. The Court heard a recording of the call, where Mr. Tamez identified himself as the caller. (Pl.'s Trial Ex. 35.)

The third call came one minute later when Mr. Tamez called Mr. Edwards

admitted) or four times.

on his cellular telephone at 10:46 a.m. (Pl.'s Trial Ex. 44.) Mr. Edwards testified that he received this call and that at the time calls to his cellular telephone were automatically forwarded to his landline. Mr. Edwards's personal phone log and the Cox log reflect that Mr. Tamez called at 10:46. Mr. Edward's cellular telephone log from Verizon confirms that this call and a subsequent call were forwarded to his landline phone on January 17, 2019, at 10:46 a.m. and 10:47 a.m. (Pl.'s Trial Ex. 40.) These calls correspond exactly to the time that Mr. Edwards's personal telephone log shows him receiving two calls from Mr. Tamez at his cellular telephone number. (Pl.'s Trial Ex. 44.) This call was also silent, although, again, Mr. Edwards credibly testified that his caller ID identified Mr. Tamez as the caller.

The fourth call was at 10:47 a.m. when Mr. Tamez again called Mr. Edwards on his cellular telephone as reflected on his personal log, Cox log, and Verizon bill. (Pl.'s Trial Exs. 40, 42, 44.) Mr. Tamez admitted making this call.

At trial, the Court heard the recordings of these four calls. The recordings of the two silent calls (the first and third calls) only contain audio of Mr. Edwards saying hello and inquiring if anyone is on the call. (Pl.'s Trial Ex. 35.) In the other two recordings, Mr. Tamez introduces himself as "Sergio with Century 21." (Pl.'s Trial Ex. 35.) He tells Mr. Edwards that a nearby property recently sold for over $300,000 and inquires when Mr. Edwards would like to sell his own house. (Pl.'s Trial Ex. 35.) In the recording of the first conversation that Mr. Tamez and Mr. Edwards had, Mr. Edwards then tells Mr. Tamez to please put him on their do not call list. (Pl.'s Trial Ex. 35.) Mr. Tamez indicates assent to Mr. Edwards's request, and then asks him if he knows anyone else looking to buy or sell. (Pl.'s Trial Ex. 35.)

In the second conversation, Mr. Tamez introduces himself as Sergio with Century 21 and again tells Mr. Edwards about the recent sale of a property in his neighborhood. (Pl.'s Trial Ex. 35.) Mr. Edwards then asks where his office is

located. (Pl.'s Trial Ex. 35.) Mr. Edwards subsequently tells Mr. Tamez that "this is the fourth phone call to my number," and that "I told you two calls ago not to call me. I'm not interested. Now, you can advise your realtor I'm suing them under the Consumer Protection Act." (Pl.'s Trial Ex. 35.) Referring to this as the fourth call (and the prior conversation as the second call) is consistent with the information on Mr. Edwards's personal log, Cox log, and Verizon bill. (Pl.'s Trial Exs. 40, 42, 44.)

At trial, Mr. Edwards confirmed that these phone calls were short, and that Mr. Tamez was polite, friendly, and not abusive during these calls. To make calls, Mr. Tamez testified that he used a database from Cole Realty to find lists of phone numbers. He testified that he would download phone lists from Cole Realty and then upload those lists to RedX, a software that would automatically dial phone numbers on his computer. According to Mr. Tamez, RedX does not show the name of the person called until the call is initiated, so when he made the fourth call, he did not realize that he was again calling Mr. Edwards at a different phone number.

Defendants argued in closing that Mr. Edwards may be lying about the two silent calls to create a cause of action under the TCPA. The only evidence that they pointed to supporting this assertion was the end of one of the silent call recordings. At the end of that recording, after Mr. Edwards says "hello" a number of times and asks whether the person is calling to check if his number is active, the prerecorded voice of an operator comes on and asks if Mr. Edwards would like to place a call. (Pl.'s Trial Ex. 35.) Defendants tried to point to this prerecorded operator message to argue that Mr. Edwards faked the silent calls. However, Mr. Edwards credibly testified that telephone solicitors often place a short, silent call to see if the number is active, i.e., to see if a human answers, before calling again and attempting to solicit. The Court finds it more likely that Mr. Tamez, or RedX, ended the call, causing the prerecorded operator voice to

be heard, than that Mr. Edwards faked the recording. Mr. Edwards's personal log, Cox log, and Verizon bill support this view of the evidence.

The Court finds Mr. Edwards's exhibits and testimony credible. Accordingly, the Court finds it more likely that Mr. Tamez called Mr. Edwards four times on January 17, 2019, than the possibility that Mr. Edwards created several false records and fabricated a story when Mr. Tamez called him for the fourth time on January 17, 2019.

### B. Mr. Tamez's Work with Century 21

Mr. Tamez was an independent contractor for Century 21 on January 17, 2019. Mr. Tamez testified that he became associated with Century 21 in 2018 after he finished the paperwork for his real estate license. He spoke to Alex Garza, Vice President of Sales at Century 21, and signed an independent contractor contract with Century 21. This contract specifies that Mr. Tamez is an independent contractor, and "not a servant, employee, joint venture or partner." (Def.'s Trial Ex. 500.) The contract also indicates that Mr. Tamez was responsible for establishing his own hours, as well as the number of hours spent rendering real estate services. (Def.'s Trial Ex. 500.)

Mr. Tamez testified that he was not required to be present at the Century 21 office. (Def.'s Trial Ex. 500.) The contract does indicate that Mr. Tamez may have been required to attend trainings and professional meetings hosted by Century 21 (Def.'s Trial Ex. 500), but both Mr. Tamez and Juan Martinez, Century 21's Broker, testified that those trainings and meetings were not required.

When Mr. Tamez began associating with Century 21, he rented a desk in the office, although he testified that that fee was only due when he made a commission from real estate sales. Mr. Tamez testified that he provided his own cell phone to make calls, used his personal computer when working, and used his own vehicle for his work as a sales associate.

Mr. Tamez also testified that Century 21 provided training and marketing materials for his role as a sales associate. While Mr. Tamez testified that he could not remember whether he paid for software like Cole Realty, a database containing phone numbers for cold calling, Mr. Martinez's testimony and company credit card indicate that Century 21 paid for the database. (Pl.'s Trial Ex. 74.) Century 21 also provided a script book for cold calling, but sales associates were not required to utilize the script book.

Mr. Tamez testified that when he sold real estate, he received a commission, which was split with Century 21, but otherwise did not receive a regular wage from Century 21.

The cold calls to Mr. Edwards indicate that Mr. Tamez represented that he was from Century 21 (Pl.'s Trial Ex. 35), and Century 21's website at the time listed Mr. Tamez as a sales associate with the company. (Pl.'s Trial Exs. 66; 67; 68.) Mr. Tamez testified that he did not place advertisements, other than posts to his personal Instagram and Facebook pages, regarding his work as a sales associate with Century 21.

Accordingly, the Court lacks evidence to find that Mr. Tamez was employed by Century 21, or that Century 21 exercised any meaningful control over Mr. Tamez's work when he was a sales associate with Century 21.

**C. Knowledge of the TCPA**

At trial, Mr. Tamez testified that he may have heard about the TCPA while working with Century 21, he did not know what the TCPA was or what it required. To avoid calling people who indicated that they did not want to be called, Mr. Tamez stated that he would use a feature in RedX that would prevent him from calling their numbers again. When asked, Mr. Tamez says that he did not believe that he attended any trainings regarding compliance with the TCPA while working with Century 21.

Mr. Martinez also testified that Century 21 did not provide trainings about

the TCPA or particularly concern themselves with the requirements of the TCPA between 2016 and 2019. In 2016, Mr. Edwards was called by a Century 21 sales associate. He told Century 21 that he was on the NDNCR and asked them to not call him again. Emails show that Mr. Martinez communicated with Cole Realty to ensure that Mr. Edwards was removed from the database's phone number lists (Pl.'s Trial Ex. 41), though the calls on January 17, 2019, show that effort was unsuccessful.

## III.    CONCLUSIONS OF LAW

### A. Telephone Consumer Protection Act

#### 1. Section (c)(5)

Under the TCPA, "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may bring an action for injunctive relief, damages, or both. 47 U.S.C. § 227(c)(5). The TCPA's regulations provide that "[n]o person or entity shall initiate any telephone solicitation to . . . residential telephone subscriber residential who has registered . . . his telephone number on the national do-not-call registry."[2] 47 C.F.R. § 64.1200(c)(2). A telephone solicitation is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). Mr. Tamez called Mr. Edwards four times, twice on each

---

[2] The Court limits its analysis to whether Defendants violated 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2). Mr. Edwards attempted to argue in his Trial Brief that he could recover statutory damages for each violation of various provisions of 47 C.F.R. § 64.1200. However, the plain language of the statute allows an individual who has received "one telephone call within any 12–month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" to bring "an action to recover for actual monetary loss from *such a violation.*" 47 U.S.C. § 227(c) (emphasis added). This language indicates that a telephone call that violates more than one provision of the regulations is considered to be a single violation rather than multiple violations.

8

of Mr. Edwards's numbers that are on the NDNCR.[3]

The silent calls are clearly included within the TCPA's authority. First, 47 U.S.C. § 227(c)(5) provides a private right of action to people who have received "more than one telephone *call* within any 12-month period." A Ninth Circuit case interpreting 47 U.S.C. § 227(b)(1)(A) found that "call" is defined as "to communicate with or try to get into communication with a person by telephone."[4] *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). This definition, which includes "try[ing] to get into communication," clearly indicates that a successful solicitation is not necessary for a call to fall within the TCPA's ambit. *Id.*

Additionally, the statute and regulation use "telephone call" and "telephone solicitation" interchangeably. 47 U.S.C. §227(c)(5); 47 C.F.R. § 64.1200(c)(2). The clear language of the statutory and regulatory provisions that define "telephone solicitation," which indicates that "initiation of a telephone call" for the purpose of encouraging the purchase of property, "which is transmitted to any person," does not require the solicitation to be completed, but instead just requires a call to be made with a specific purpose. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). In an unpublished opinion, the Ninth Circuit indicated an individual has standing to pursue TCPA claims even when the calls are not

---

[3] The parties stipulated that both of Mr. Edwards's phone numbers have been registered on the NDNCR since June 28, 2003.

[4] Though this opinion applied the then-existing two-step analysis under *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, the Court ultimately found, after a careful analysis of the statute, that the TCPA's language, and the ordinary meaning of the term "call" meant that "Congress used the word 'call' to refer to an *attempt* to communicate by telephone." *Satterfield,* 569 F.3d at 953 n.3 (emphasis added). Recently, the Ninth Circuit, in a post-*Loper Bright v. Raimondo Inc.*, 603 U.S. 369 (2024) analysis, concluded that *Satterfield*'s substantive analysis would be the same even in the absence of *Chevron* deference. *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1123–24 (9th Cir. 2026). The language of *Howard* also concerns a general definition of call, rather than confining its analysis to 47 U.S.C. § 227(b).

answered, indicating that violations occur even if a call is not answered. *Romero v. Dep't Stores Nat'l Bank*, 725 F. App'x 537, 539 (9th Cir. 2018). And multiple courts have explicitly recognized a plaintiff may assert a TCPA violation for unanswered calls or calls only made with the purpose of solicitation. *Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *8 (D. Ariz. Apr. 8, 2019) (finding that "the TCPA can be violated merely upon the initiation of a call for a prohibited purpose"); *Fillichio v. M.R.S. Assocs., Inc.*, No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010) ("[T]he prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the intended recipient does not answer the calls. It is the mere act of placing the call that triggers the statute.").

### 2. Vicarious Liability

A defendant may be held vicariously liable for TCPA violations "where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and [the] third-party caller." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072 (9th Cir. 2019), as amended on denial of reh'g and reh'g en banc (May 6, 2019) (quotations omitted). There are several ways to establish an agency relationship, including employment (respondeat superior), actual authority, apparent authority, and ratification. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 448–49 (9th Cir. 2018).

### a. Employment

The fact that Mr. Tamez was labelled an independent contractor does not foreclose a finding that an agency relationship existed. *Henderson*, 918 F.3d at 1073 ("[W]hether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship") (citing Restatement § 1.02). "In determining whether vicarious liability may be imposed . . . to the same extent as an employer may be held liable for the conduct of its employee," the Ninth Circuit has adopted the

10

following non-exhaustive factors:

> (1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities [and the place of work], 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business.

*Jones*, 887 F.3d at 450.

Applying the law to the facts, Mr. Tamez was not an employee of Century 21. While Century 21 supplied a subscription to Cole Realty, provided training and marketing materials, and only charged a fee for a desk if Mr. Tamez made a real estate sale. However, Mr. Tamez had significant control over his own work. He could choose his hours and where he worked, he controlled how his work was conducted, he supplied his own laptop, cellphone, and car, and he was only paid if he made a real estate sale. The Court therefore concludes that Mr. Tamez was not employed by Century 21.

### b. Actual Authority

"Actual authority, arises through the principal's assent that the agent take action on the principal's behalf." *Jones*, 887 F.3d at 453 n.3 (internal quotations and citations omitted). "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement § 2.01. Actual authority is limited to actions "specifically mentioned to be done in a written or oral communication" or "consistent with" a principal's "general statement of what the agent is supposed to do." *Jones,* 887 F.3d at 449 (quoting *Salyers v. Metro. Life*

11

*Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017)). There is no evidence that Mr. Tamez had actual authority to call Mr. Edwards in violation of the TCPA. Mr. Tamez was not required to make cold calls at all, and had the freedom to pursue real estate sales in a manner dictated only by his own preferences. Accordingly, the Court concludes that sufficient evidence does not exist to find that Mr. Tamez acted with actual authority when he called Mr. Edwards on January 17, 2019.

### c. Apparent Authority

"Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question." *NLRB v. Dist. Council of Iron Workers of the State of Cal. and Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997) (internal citations omitted). "Apparent authority cannot be established merely by showing that [the agent] claimed authority or purported to exercise it, but must be established by proof of something said or done by the [principal] on which [the third party] reasonably relied." *Id.* Such statements can include "direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area which the agent acts and negotiates." *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir. 1976) (citation omitted). The Court lacks evidence that Century 21 made any manifestations to Mr. Tamez or Mr. Edwards that would indicate that Mr. Tamez had apparent authority to call Mr. Edwards in violation of the TCPA. Accordingly, the Court concludes that Mr. Tamez was not acting with apparent authority when he called Mr. Edwards on January 17, 2019.

### d. Ratification

Ratification is "'the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.'" *Kristensen*

*v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (quoting Restatement (Third) of Agency § 4.01(1)). Ratification occurs when the principal accepts the benefit of the agent's act either with actual knowledge of the material facts or with "knowledge of facts that would have led a reasonable person to investigate further"—also known as "willful ignorance." *Henderson*, 918 F.3d at 1073, 1075. Mr. Edwards presented no evidence that Century 21 had actual knowledge that sales associates were violating the TCPA when cold calling. Additionally, while Mr. Edwards showed that Century 21 was aware that he was called in 2016, even though he was on the NDNCR at the time, there is no evidence that Century 21 had enough knowledge that would have led a reasonable person to investigate whether Cole Realty was providing lists containing people on the NDNCR. *See Henderson*, 918 F.3d at 1076 (finding evidence of willful ignorance because USA Funds' audit findings and its knowledge of industry practices indicated that its debt collectors were repeatedly violating the TCPA). Accordingly, the Court concludes that Century 21 did not ratify Mr. Tamez's conduct.

### 3. Safe Harbor

Section (c)(5) contains a safe harbor provision, which provides an affirmative defense if "defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Applying the law to the facts, the Court holds that there is insufficient evidence to find that Mr. Tamez established and implemented any procedures to effectively prevent telephone solicitations in violation of the TCPA and the regulations promulgated therein. While Mr. Tamez testified that he would block someone's number on RedX if they asked to not be called again, he testified that he had no knowledge of the TCPA, and established no practices to prevent telephone solicitations that violated the TCPA.

**4. Damages**

When a defendant violates Section 227(c)(5) of the TCPA, a plaintiff is entitled to receive up to $500 per violation. This amount may be trebled up to $1,500 per violation if the TCPA is willfully or knowingly violated. 47 U.S.C. § 227(c)(5). A defendant willfully or knowingly "violates the TCPA where it 'knew that it was engaging in the conduct that gave rise to liability.'" *Carrodine v. Zupax Mktg., LLC*, 351 F.R.D. 164, 169 (D. Nev. 2026) (quoting *Wakefield v. ViSalus, Inc.*, 2019 WL 2578802, at *2 (D. Or. June 24, 2019)). Applying the law to the facts, the Court holds that $250 in damages for each unlawful phone call is sufficient. Mr. Tamez used Cole Realty to find phone numbers to call, and he did not call Mr. Edwards again on the same telephone number after Mr. Edwards asked to be put on Century 21's internal do-not-call list.

**B. Nevada Deceptive Trade Practices Act**

NRS 41.600 provides a private cause of action for "any person who is a victim of consumer fraud." NRS 41.600. "Consumer fraud" is defined as "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive." NRS 41.600(2)(e). A claim under the Nevada Deceptive Trade Practices Act ("NDTPA") "requires a 'victim of consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff.'" *Sattari v. Wash. Mut.*, 475 Fed. Appx. 648 (9th Cir. 2011) (quoting *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009)).

Under NRS 598.0918, "[a] person engages in a 'deceptive trade practice' if, during a solicitation by telephone or sales presentation, he or she . . . [r]epeatedly or continuously conducts the solicitation or presentation in a manner that is considered by a reasonable person to be annoying, abusive, or harassing." NRS 598.0918(2). The Court finds that there is no evidence that Mr. Tamez conducting the solicitation in a manner that was annoying, abusive, or harassing. Mr. Edwards agreed that Mr. Tamez was polite and friendly, and the calls were very

short. Accordingly, the Court concludes that Mr. Tamez did not commit a deceptive trade practice as defined in NRS 598.0918(2).

### C. Damages for Wiretapping under NRS 200.620

NRS 200.620 makes it unlawful for any person to "intercept or attempt to intercept any wire communication" absent certain emergency conditions. NRS 200.620(1). NRS 200.690(1)(b) provides a private right of action against "[a] person who willfully and knowingly violates NRS 200.620." NRS 200.690(1)(b). A plaintiff whose wire communication is intercepted without their consent may recover (1) "actual damages or liquidated damages of $100 per day of violation but not less than $1,000, whichever is greater; (2) [p]unitive damages; and (3) [] costs reasonably incurred in the action, including a reasonable attorney's fee." NRS 200.690(1)(b). At trial, Defendants made broad statements indicating Mr. Tamez lost money because he did not make cold calls after Mr. Edwards filed a lawsuit against him. However, there was no evidence adduced suggesting that Mr. Tamez was actually damaged by the recording of the phone calls. Additionally, even assuming that Mr. Tamez stopped cold calling because Mr. Edwards recorded him, Defendants provided no specific evidence as to the measure of damages that Mr. Tamez suffered. The Court therefore declines to award any actual damages for Mr. Edwards's recording of the phone calls. The Court also declines, as is within its discretion under the statute, to award liquidated damages or punitive damages.

### IV. CONCLUSION

THEREFORE, in light of the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Judgment is entered against Defendant and in favor of Plaintiff for four violations of 47 U.S.C. § 227(c)(5).

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Plaintiff is

awarded damages in the amount of $1,000.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Judgment is entered against Plaintiff and in favor of Defendant on Plaintiff's NDTPA claim.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Defendant is awarded no damages for Plaintiff's violation of NRS 200.620.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the parties shall bear their own costs, expenses, and attorney's fees.

This order leaves no claims pending, and the Clerk of Court is directed to ENTER FINAL JUDGMENT and CLOSE THIS CASE.

DATED THIS 16th day of July 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

16